**In re SILICON VALLEY TELECOM EXCHANGE, LLC, Debtor.**

**No. 01–55137–ASW.**

United States Bankruptcy Court, N.D. California.

Oct. 8, 2004.

Scott L. Goodsell, Campeau, Goodsell and Diemer, San Jose, CA, for Debtor.

MEMORANDUM DECISION DETERMINING VALUE OF DEBTOR'S LEASEHOLD INTEREST

ARTHUR S. WEISSBRODT, Bankruptcy Judge.

Silicon Valley Telecom Exchange, LLC ("Debtor") is the Debtor in Possession in

this Chapter 11[1] case, and Corporate Builders, Inc. ("CBI") is a creditor in the case. The Debtor is represented by Marc L. Pinckney, Esq. of Campeau Goodsell Smith, LC; CBI is represented by David A. Tilem, Esq. and Leslie M. Baker, Esq. of the Law Offices of David A. Tilem.

Debtor and CBI have each filed a plan of reorganization. The Debtor's plan proposes to pay all creditors in full over time, with shareholders retaining their interests in the Debtor. CBI's plan proposes to pay creditors only 75% of their claims, with nothing paid to or retained by the Debtor's shareholders. Each party has filed objections to confirmation of the other's plan on various grounds.

One of the objections to CBI's plan that has been raised by the Debtor is failure to comply with § 1129(a)(7)(A)(ii), which requires that a plan provide all creditors and interest holders with at least as much as they would receive if the bankruptcy estate's assets were liquidated under Chapter 7. The Debtor contends that its estate is solvent, with the value of its assets exceeding its total liabilities—accordingly, if the estate were liquidated in Chapter 7, creditors would be paid in full and a surplus would remain for distribution to shareholders. However, CBI's plan offers only 75% to unsecured creditors and nothing to shareholders.

It is undisputed that the Debtor's primary asset is its leasehold interest in real property, but the parties disagree about the value of that interest. An evidentiary hearing has therefore been conducted to determine the value on the stipulated date of December 15, 2003 ("Valuation Date"), and the matter has been submitted for decision. This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I.

### FACTS

The facts are largely undisputed.

The Debtor is a limited liability company with Fernando Don Rubio II ("Rubio") as its Managing Member. Rubio is also the Managing Member of Silicon Valley Telecom & Internet Exchange ("SVTIX"), and the Chief Executive Officer of Rubio & Associates ("RA"). All three entities filed Chapter 11 petitions on October 22, 2001.

On May 1, 1999, RA leased a building at 250 Stockton Avenue in San Jose ("Building") from the San Jose Unified School District under a lease ("Master Lease") that runs to March 2024, and assigned the Master Lease to Debtor. The Building consists of approximately 93,256 square feet, with 47,920 square feet on the ground floor and 45,336 square feet in the basement. The Building was built in 1947 but renovated in 1999 and 2000 for use by the telecommunications industry.

The Debtor's business operations consist of subleasing space in the Building. On the Valuation Date, 53,651 square feet were vacant (17,809 on the ground floor and 35,848 in the basement), and the Debtor had three subtenants: Verio—with 25,399 square fee (17,111 on the ground floor and 8,288 in the basement); NTT—with 11,012 square feet (all on the ground floor); and SVTIX—with 3,188 square feet[2] (1,988 on the ground floor and 1,200 in the basement). The Debtor previously

---

**1.** Unless otherwise noted, all statutory references are to Title 11, United States Code, as applicable to cases commenced on October 22, 2001.

**2.** SVTIX operates a "meet me room", in which it subleases space to users of telecommunications services available in the Building.

had a fourth tenant, Enron, which subleased 18,253 square feet (17,809 on the ground floor and 444 in the basement)—Rubio testified that Enron vacated sometime during the summer of 2002 and "abandoned" its lease in early 2003.

Rubio testified that he has offered space in the Building by publicizing it to brokers and prospective tenants, and has received several responses during the past four years—none of them has materialized, sometimes because the tenants wanted improvements made at an expense that Rubio could not or would not incur. At time of trial, Rubio said that he was negotiating two transactions that included both ground floor and basement space totaling 40,000 square feet. The asking price for both ground floor and basement space is a blended rate of $6.00 per square foot, but Rubio was prepared to make various concessions that would yield an "effective" rate of approximately $2.00 per square foot.

The bankruptcy schedules and monthly operating reports filed by the Debtor value the Building at $2,000,000. Rubio testified that he no longer believes that to be the value, but did not change the figure because the United States Trustee told him it should remain constant. At trial, each party offered an expert witness to opine as to the value of the Building on the Valuation Date. Debtor's witness Chris Carneghi ("Carneghi") is an appraiser of commercial real estate who was qualified to testify as an expert concerning the value of commercial properties in the San Francisco Bay area, including but not limited to those used for telecommunications purposes. CBI's witness Eric Ham ("Ham") is a commercial real estate broker who was qualified to testify as an expert concerning fair rental rates for properties used as "data centers", and as to whether the Building is suitable for industrial use.[3]

### A. Carneghi Opinion

Carneghi testified that he believed the fair market value of the Debtor's leasehold interest under the Master Lease on the Valuation Date was $5,610,000.[4] He based that conclusion upon a discounted cash flow analysis that considered revenues and expenses projected for the Building during the twenty years that remain for the term of the Master Lease.

The actual rents being received from existing tenants are known, but over half of the Building was vacant at time of trial and Carneghi did not believe that the existing leases were all likely to be renewed when they expired during the term of the Master Lease. It was therefore necessary to determine the fair rental value of the existing and future vacant space in order to estimate revenues that could be collected from new tenants. Carneghi concluded that the monthly rental rate was $1.80 per

3. Ham was also originally offered as an expert concerning customary brokerage commissions, but he was rejected upon the Debtor's objection that CBI had not disclosed him as an expert on that subject. After further discovery, Ham testified about brokerage commissions that he had received and those that he believed were typical. CBI did not renew its request to have Ham qualified as an expert on commissions, and the Court did not so qualify him, but the Debtor did not object to his opinion testimony about that subject.

4. Carneghi's written appraisal report filed by the Debtor states the value as $5,770,000. However, it was discovered during trial that the report reflected revenues in the final calendar year of the Master Lease for a twelve month period, but should have reflected only a three month period because the term expired at the end of March. Carneghi therefore calculated the present value of nine months' rent in the final calendar year and reduced his original valuation by the amount of that overstatement to arrive at an adjusted value of $5,610,000.

square foot for the ground floor space and $1.15 per square foot for the basement space, on the "triple net" basis that he testified was typical in the industry.[5]

Based on rents being paid for comparable space in other buildings, Carneghi considered the existing lease rates for Verio ($1.96 per square foot) and NTT ($2.32 per square foot) to exceed current market rates, although that was not the case with SVTIX' rate of $4.80 per square foot—SVTIX differs in that Verio and NTT each have a triple net lease, whereas SVTIX has a "gross" lease that does not require the tenant to pay any of the property's expenses in addition to rent. To determine market rates, Carneghi evaluated leases at six other similar properties in the area and found one on Bassett Street in Santa Clara ("Bassett Property") to be the most comparable to the Building. The Bassett Property was leased by ATT Wireless in July 2003 for telecommunications use, and offered 33,000 square feet of the same kind of space that is available at the Building, charging $1.80 per square foot on a triple net basis. Carneghi noted that market conditions on the Valuation Date and in July 2003 were "substantially lower, some might say depressed from what it was several years ago", such that three of the other properties were less comparable than the Bassett Property because they were leased in late 2000 when market rates were much higher. Carneghi found the fifth property less comparable than the Bassett Property because it had not yet been leased and was merely listed for lease at $2.25, whereas asking prices are "invariably" negotiated down-

ward. Carneghi considered the sixth property to be less comparable than the Bassett Property because it represented an asking price of $1.00 rather than an actual lease rate, and only half of it was designed for telecommunications use, with the other half offered for use as a research and development facility.

With respect to the basement space in the Building, Carneghi testified that such space is "inherently" less valuable than ground floor space, and noted that a 34% "differential" existed between what Verio's lease at the Building charges for its ground floor space ($1.98) and its basement space ($1.31). He found an even greater differential (49%) in an office building where both kinds of space are used—however, he pointed out that, while a basement's lack of windows is a drawback for an office, it is actually an advantage for a telecommunications tenant concerned about security. Therefore, Carneghi applied a differential of 35% to reduce the $1.80 rate for ground floor space, and thereby arrived at a rate of $1.15 for the basement space.

To account for the fact that the Master Lease has a remaining term of twenty years, Carneghi applied an "escalation" factor for future rents. With respect to existing leases, he applied the rate increases called for by the leases, assumed that Verio would not renew its lease because it has vacated the Building prior to the end of its lease term, and assumed that NTT and SVTIX were likely to renew because they had invested in their spaces and were operating businesses there.[6] As to future

---

5. Under a triple net lease, the tenant reimburses the landlord for the expense of the property's taxes, insurance and maintenance.

6. CBI argues that SVTIX' sublease may not be enforceable as an oral contract, so that its rent should be excluded from the value analy-

sis. Carneghi testified that his calculations are based only on whether space is vacant or occupied and, if SVTIX were not the tenant, he would expect another one to "step in almost immediately" and take over SVTIX' operation, because the business appears to be

rents for new tenants, Carneghi estimated a 50% rate of renewal and assumed a 3% annual rent increase, which he testified is an industry standard reflecting general inflation within the economy.

Carneghi used the foregoing rental rates and assumptions [7] to calculate the potential gross income from the Building for each year through March 2024. He then reduced those figures to account for "lease up costs" and a 5% "vacancy/collection" factor. He testified that the latter is standard because experience shows that it is rare for any income property to be fully occupied at all times, and to achieve 100% debt collection, so use of this factor is "a way of reducing it to a normalized operation" and "95% is often felt to be equilibrium in the marketplace". As for "lease up costs", the term refers to losses or reductions rather than actual expenses. They include lack of rent for the two year period that is typical of the time required to find new tenants when vacant space becomes available in the telecommunications industry; 20% of the first year's rent as an average brokerage commission within "market parameters" not limited to telecommunications properties, for finding new tenants as necessary during the twenty year remaining term of the Master Lease; and an "entrepreneurial profit" of $2,500,000. Carneghi explained the last term as a deduction in value spread over the remaining term of the Master Lease to provide an incentive for investors to acquire a property that is partially vacant and incur the risks entailed in attempting to achieve and maintain full occupancy. The figure represents 50% of the other lease up costs plus fixed expenses & leasing commissions, which Carneghi testified

is "a judgment, a consensus of the reasonable thing to do with a partly vacant building; if not a standard it's a fairly common judgment of how to handle that issue".

As for expenses, Carneghi relied on the Debtor's actual expenses reflected by the Master Lease, property tax records, and information supplied by Rubio. He provided for a 3% annual escalation rate, based on the industry standard to reflect general inflation. Carneghi noted that, since most operating expenses are reimbursed by tenants, expenses do not have "a real big impact" on his analysis.

Carneghi calculated net cash flow by adjusting income through the foregoing reductions, then deducting expenses. He applied a discount rate of 11% to the net cash flow and arrived at $5,610,000 as the fair market value of the Debtor's leasehold interest. Carneghi explained that the 11% discount rate represents his opinion of the rate of return that an investor would want to achieve—he noted that his opinion was confirmed by a "real world test" in the form of the Bassett Property where the discount rate was 10.8%, and he "rounded up" to account for a greater risk posed by the partially vacant Building. Carneghi said that he would not characterize his analysis as either conservative or aggressive, but simply accurate, because it is based on actual data and standard assumptions, and has been born out by the Bassett Property.

Carneghi testified that he expects the Building can be fully leased within two years due to increasing demand for space, but it is the demand that controls rather than measures such as offering reduced

"viable" with positive cash flow, and "infrastructure" in place.

7. He also added a management fee of 2% that is called for by the current leases of Verio and

NTT, but testified that such fees are "no longer obtainable in the marketplace" so they have not been factored into future rents for space that is currently vacant.

rents. He believes that demand for telecommunications space in the area is "probably starting to increase a little bit" after having dropped "dramatically from the peak" in 2000.

## B. Ham Opinion

Ham testified that there are currently three buildings in the San Jose area that are designed for use as a telecommunications facility, and some fifteen or twenty that could be changed to permit such use depending on a tenant's criteria. The Building is one of the three, and the other two are located on South Market Street ("Market Property") and Spacepark Drive ("Spacepark Property"). The Market Property has approximately 100,000 square feet available for telecommunications use, of which 20,000 is vacant—the Spacepark Property has approximately 180,000 square feet available for telecommunications use, of which 140,000 is vacant—there are "several hundred thousand square feet" available in the fifteen or twenty other buildings that might be made suitable depending on a tenant's criteria. Ham characterized the local market for telecommunications space as "extremely soft", with demand having "definitely tailed off" starting in mid–2001 when the market changed "very, very drastically"— prior to that time, tenants wanted space immediately without regard to price.

Ham testified about four criteria used by brokers to evaluate telecommunications facilities: connectivity, infrastructure, power provider, and the landlord's financial strength. Connectivity refers to the number of "carriers", or service providers, available in a building, "the more carriers the better"—the Building has six or seven, the Market Property has over twenty, the Spacepark Property has fifteen; the sole tenant of the Bassett Property is ATT Wireless, which is owned by ATT, and ATT itself is a carrier. Infrastructure refers to physical attributes such as space and suitability for necessary equipment; it is ranked under a tier system. Tier IV is designed to perform almost continuously with an absolute minimum amount of "downtime", capable of operating without interruption 99.99% of the time, i.e., all but seven minutes per year; Tier III is designed for 99.82% performance, or all but 1.6 hours per year; Tier II is designed to function for all but 22 hours per year; Tier I is designed without a "backup system" that can assure operation 24 hours a day. Ham said there is no Tier IV facility available in the San Jose area, although "money in unlimited sums can fix anything"— the Building is Tier III or Tier II, as are the majority of properties; the Spacepark Property is Tier III and Ham did not know the Tier level of the Bassett Property. Power refers to provision of electricity, which is "critical" for telecommunications facilities because their tenants are among the highest power users of any industry. There are two local providers, Pacific Gas & Electric ("PG & E") serving San Jose (and the Building), and Silicon Valley Power serving Santa Clara (and the Bassett Property)—the latter charges approximately 30% to 40% less than the former, which can save a tenant under a triple net lease as much as $1.50 per square foot per month. The landlord's financial strength is important because telecommunications tenants make "significant" investments to install equipment and therefore "don't like to move", and also want to be assured that the property will be operated efficiently and securely. With respect to this factor, Ham considers the Market Property "excellent" and the Building "at the lowest level".

Ham testified that other important factors in comparing properties include a neighborhood's safety, proximity to desirable residential areas, and "ingress and

egress" by freeway. He said that the Building is in "kind of a heavy industrial area", which is not widely regarded as "one of the safest or nicest neighborhoods around" and generally considered to be a "lower level industrial area". A "very important" factor is proximity to "connectivity rings", or fiber networks laid by service providers, and the Building ranks "very good if not excellent" on that score.

Ham also considered "in one way or another" at least fifteen or twenty other properties, "every potential space that could work for a telecom or data center user looking at the entire market", although he did not rely on leases executed within the past year. He did not include the Bassett Property in his review because he believed it had been built specifically to suit its tenant and would therefore not be comparable to the Building, where tenants would have to take what is available or have changes made.[8]

Based on all of these factors, Ham concluded that the rental rate for the ground floor space is $1.50 per square foot, on a triple net basis. He acknowledged that to be an "imprecise calculation", after "a fair amount of guessing" based on what landlords are willing to do and what a tenant is likely to do.

With respect to the basement space, Ham considered it unsuitable for telecommunications use, for a "long list of reasons", the "predominate" one being that it is a basement, with inadequate ceiling height and a lack of raised floors to accommodate the necessary equipment and cooling systems. However, he agreed that there are "engineering solutions" to such physical limitations, which have been suc-

cessfully applied in the Market Property and even in parts of the Building. Nevertheless, Ham did not believe there would be any demand for the basement space as telecommunications space, given the amount of other available space in the current market, and thought that it was not suited for any use other than possibly storage by existing tenants. He said that, assuming a tenant could be found who wanted it for telecommunications use, its rental value would be "difficult" to fix because there is no comparable space, but he estimated a range of 25¢ to 50¢ per square foot, possibly 40¢.[9] Ham acknowledged that tenants do make concessions if a property has "appealing" aspects, and agreed that the Building's location within a mile of the Market Property is advantageous because the MAE (Metropolitan Area Exchange) West is located there. That is a primary internet interconnection point for the western United States, and charges for connecting to it are not incurred within a one mile distance.

Ham disagreed with Carneghi's use of a 20% brokerage commission as part of lease up costs, saying that he had found it typical in his fifteen years' experience for brokers handling telecommunications properties to be paid a "full commission", or a "commission and a half". He said that a full commission applied to transactions where only one broker was involved, *i.e.*, the sole broker customarily received from 5% to 6% of rent for the first five years, plus half that amount for the next five years. The commission and a half applied to transactions with two brokers. In those situations the landlord's listing broker received the full commission and the tenant's

---

8. Carneghi disagreed that the Bassett Property was built to suit the tenant, because the public records show that the construction permits were issued before the lease was executed.

9. Carneghi testified that he was unaware of *anything* that could be rented in San Jose for 40¢ per square foot and said that "it's just not a rent that's plausible in the market".

broker received half of that amount. However, Ham did not have an opinion as to what commission rates would be customary in the future.[10]

Ham was not qualified to perform a discounted cash flow analysis, so the parties stipulated that Carneghi would prepare one based on Ham's figures. Carneghi prepared two versions: CBI's Exhibit 24 uses Ham's rental rates for both floors, Ham's commission rates, and Carneghi's expenses, and yields a total value for the Building of $2,240,000; CBI's Exhibit 25 uses Ham's rental rates for both floors, Carneghi's commission rates, and Carneghi's expenses, and yields a total value for the Building of $3,000,000.

## II

### ANALYSIS

Carneghi and Ham are each knowledgeable in their fields, but the Court is more persuaded by Carneghi's opinion. He is a well-qualified appraiser of commercial real estate, including telecommunications facilities. His analysis is straightforward and sound, applying standard assumptions that are objectively reasonable, and which are confirmed to some extent by actual circumstances such as the Bassett Property (and to a lesser extent by Rubio's pending negotiations for space in the Building). Ham's experience is as a broker, which is not entirely dissimilar to the experience of an appraiser but is more limited, and his analysis is not as comprehensive or well-supported as Carneghi's appraisal.

For example, Ham admits that his conclusion of a $1.15 per square foot rental rate for the ground floor space involved "a fair amount of guessing" about what landlords and tenants would want, rather than analysis of actual recent transactions. With respect to the basement space, Ham believes that it would not attract a telecommunications tenant because it lacks ceiling height and raised floors. Yet Verio, Enron, and SVTIX all leased basement space for telecommunications uses, and Rubio has been negotiating with two potential tenants interested in basement space for that purpose. Ham concedes that the basement's shortcomings could be overcome by engineering, as has been done at the Market Property. He also acknowledges that the Building is at a Tier III or II level (which is on a par with most other properties) and that its proximity to the MAE West at the Market Property is an advantage. And Ham does not contest Carneghi's belief that the market for telecommunications space is gradually improving. These facts do not support Ham's conclusion that the basement space is so ill-suited for telecommunications use as to render its value only 40¢ per square foot, a figure that Carneghi testified without contradiction is not available anywhere in San Jose, and which he credibly found to be "just not plausible".

Another weakness in Ham's analysis is the high brokerage commission rate that he assumes. Ham has found the rates of full commission or commission and a half to be typical in his fifteen years of experience, but he readily admits that the market changed "very, very drastically" in 2001, and he has no opinion about what commissions will be in future. Carneghi notes without contradiction that commissions would not be paid on renewed leases, and are always negotiable depending on

---

10. Carneghi noted that such commissions were unlikely to apply to every transaction that occurred during the remaining twenty year term of the Master Lease, because lease renewals would not generate new commis- sions, and commissions are always negotiable depending on the market at the time. He believed that his 20% figure represented a reasonable estimate of what commissions would average over the relevant period.

the market. Ham did not contest Carneghi's estimate that 50% of leases would be renewed so, over the twenty year term that remains under the Master Lease, it is likely that no commissions would be paid on many of the transactions that occur. Under such circumstances, Carneghi's average of a 20% commission is a more realistic estimate of what this expense would total for the twenty year term.

CBI found fault with a number of points in Carneghi's analysis, but they were adequately explained. For example, CBI argued that the rent charged for the Bassett Property is not $1.80 per square foot as Carneghi stated, but only $1.62 per square foot, plus a management fee of 18¢ per square foot. Carneghi explained that landlords sometimes reflect their charges that way for "psychological" reasons, but the amount received for the property remains a total of $1.80 per square foot no matter what it is called. CBI scoffs at the notion of a tenant such as ATT Wireless being influenced by psychology, but the fact is that Carneghi is correct that the total received by the landlord is $1.80, regardless of whatever reason the landlord may have had for breaking it down under two different names. In the case of the Building, Carneghi's analysis reflects a rent charge to new tenants of $1.80, with no additional charge for a management fee, yielding the same result to the landlord as for the Bassett Property. CBI also argued that Carneghi's 3% rent escalation should not be applied to the first two year lease up period, during which no rents would be received. The Debtor pointed out that the increase for the first two years is not reflected as income, but merely serves to raise the rent by a total of 6% at commencement of the third year, so that a new tenant arriving then would pay $1.80 plus 6% rather than $1.80. CBI also complained that Carneghi did not verify the Building's expenses that were used in his analysis and merely accepted the figures provided by Rubio, but CBI offered no evidence that the expenses were inaccurate.

Finally, the Court notes a point raised by the Debtor, concerning Ham's credibility. Ham testified that he is not being paid for his testimony, but hopes that CBI will retain him as its leasing agent if CBI gains control of the Building by having its plan confirmed. As the Debtor puts it, Ham's ability to be paid for the services he has rendered to CBI so far is contingent upon his ability to convince the court that his opinion of value is correct. The Debtor's point is a legitimate one. Ham clearly has a vested personal interest in the outcome of this evidentiary hearing. However, the Court did not find Ham to lack credibility. Ham appeared to be making an effort to form an honest opinion based on the data available to him and given the scope of his experience.

## CONCLUSION

For the foregoing reasons, the Court finds the fair market value of the Debtor's leasehold interest in the Building to be $5,610,000.00. Counsel for the Debtor shall submit a form of order so providing, after review by counsel for CBI.

The issue of how that value affects confirmation of CBI's plan was not tried and this Court makes no findings or rulings on that issue at this time.